**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ARTHUR ALMENDAREZ, | ) | |
| | ) | Case No. 23 cv 3165 |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| VICTOR SWITSKI, GERI LYNN YANOW, | ) | |
| as SPECIAL REPRESENTATIVE for | ) | |
| JAMES HANRAHAN AND JACK | ) | |
| LUMSDEN, LEROY ALMANZA, | ) | |
| MARJORIE O'DEA, THOMAS JONES, | ) | **JURY TRIAL DEMANDED** |
| DANIEL CENTRACCHIO, JAMES | ) | |
| CAPESIUS, TONY JIN, MARK | ) | |
| SCHEITHAUER, ROBERT GALL, JOEL | ) | |
| LEIGHTON, THE CITY OF CHICAGO, and | ) | |
| UNKNOWN EMPLOYEES OF THE CITY | ) | |
| OF CHICAGO | | |
| *Defendants.* | | |

## <u>COMPLAINT</u>

NOW COMES Plaintiff, ARTHUR ALMENDAREZ, by his attorneys LOEVY &

LOEVY, and complaining of Defendants former Detectives VICTOR SWITSKI, GERI LYNN

YANOW, as SPECIAL REPRESENTATIVE for JAMES HANRAHAN AND JACK

LUMSDEN, LEROY ALMANZA, MARJORIE O'DEA, THOMAS JONES, DANIEL

CENTRACCHIO, JAMES CAPESIUS, TONY JIN, MARK SCHEITHAUER, ROBERT

GALL, former Cook County State's Attorney JOEL LEIGHTON, the CITY OF CHICAGO, and

UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, and states as follows:

## INTRODUCTION

1.      In 1990, Plaintiff Arthur Almendarez was wrongly convicted of committing crimes of which he is wholly innocent. Mr. Almendarez spent more than three decades in prison until he was finally released.

2.      In fact, there may have been no crime at all, but an unfortunate, accidental apartment fire that resulted in the tragic loss of two lives.

3.      Mr. Almendarez was not the only one wrongfully charged and convicted of the deaths that resulted from the fire. Two acquaintances—John Galvan and Francisco Nañez—were also charged and convicted. However, the evidence used against all three was false and fabricated.

4.      Included among that fabricated evidence was an involuntary false confession attributed to Mr. Almendarez, which was concocted and coerced by Defendants after hours of illegal interrogation. During this interrogation, Defendants physically and mentally abused Mr. Almendarez. Eventually, Mr. Almendarez succumbed to the pressure and abuse and signed a false confession implicating himself in a crime he did not commit.

5.      In an attempt to corroborate Mr. Almendarez's false, involuntary confession, Defendants used the same techniques of physical torture and mental abuse on his co-defendants, Mr. Galvan and Mr. Nañez, to secure false statements from them. The Defendants also fed the same false details about setting the fire to all three men. However, the story the three were forced to recite was, in truth, a scientific impossibility.

6.      After over three decades fighting for his freedom, having spent well over half his life in prison, Mr. Almendarez was finally exonerated.

7.     Mr. Almendarez now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

8.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' violations of Plaintiff's rights secured by the federal Constitution and Illinois State law.

9.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's wrongful conviction.

## PARTIES

11.     Arthur Almendarez was just shy of his twenty-first birthday, newly married, and working to support his three-month-old daughter at a packaging factory in Chicago when he was ripped from his life, arrested, prosecuted, and wrongfully convicted for a crime for which he was totally innocent.

12.     At all times relevant to the events described in this complaint, Defendants Victor Switski (#9407), James Hanrahan (#17117), Leroy Almanza, Marjorie O'Dea (#16455), Thomas Jones (#16465), Daniel Centracchio (#6226), James Capesius (#11093) Tony Jin (#16941), and other unknown law enforcement officers were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

Plaintiff collectively refers to the Defendants listed in Paragraph 12 as "Police Officer Defendants."

13. At all times relevant to the events described in this complaint, Defendants Mark Scheithauer (#17161) and Robert Gall (#12732) were investigators in the Bomb and Arson Section of the Chicago Police Department, acting under color of law and within the scope of their employment for the City of Chicago.

14. At all times relevant to the events described in this complaint, Defendant Jack Lumsden was a Fire Marshal in the Chicago Fire Department, acting under color of law and within the scope of their employment for the City of Chicago. Plaintiff collectively refers to the Defendants listed in Paragraphs 13 and 14 as "Defendant Fire Investigators."

15. Geri Lynn Yanow, the Special Representative for James Hanrahan and Jack Lumsden, deceased, is named as a Defendant in her capacity as Special Representative of James Hanrahan and Jack Lumsden to defend this action on behalf of Defendants Hanrahan and Lumsden. All factual allegations will continue to refer to Defendants Lumsden and Hanrahan, not Ms. Yanow, for clarity in identifying each Defendant's conduct.

16. At all times relevant, Defendant Joel Leighton was an attorney employed as an Assistant State's Attorney in the Cook County State's Attorney's Office. He acted under color of law and within the scope of his employment for the Cook County State's Attorney's Office. Defendant Leighton is sued for actions he undertook in conspiracy with the Police Officer Defendants in his investigatory capacity.

17. The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of the individual Defendants named in this complaint acted at all relevant times as agents or employees of the City of

4

Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

18.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Fire

19.     During the early morning hours of September 21, 1986, a fire broke out at 2603 24th Place (hereinafter "2603"). The fire was extensive and engulfed multiple floors of the building.

20.     Most of the residents escaped, but tragically, two people died before firefighters could reach them.

### The Initial Investigation

21.     A police investigation into the cause and origin of the fire commenced.

22.     Citing his walkthrough of the scene and before any testing had been done, Defendant Mark Scheithauer of the CPD Bomb and Arson Section opined that a liquid accelerant was likely used in the fire. He classified the fire as arson. Defendant Scheithauer's partner, Defendant Robert Gall, and Defendant Jack Lumsden supported this conclusion.

23.     When he issued his arson conclusion, Scheithauer was aware of a statement from a woman named Soccoro Flores, who was awake when the fire started. Flores told police that she had heard voices in the alley. She looked out and saw a person holding an object, which they threw in the direction of the 2603 building. The building erupted into flames shortly thereafter.

5

24.     Flores did not recognize the individual and provided no names to the police.

25.     Plaintiff Almendarez had nothing to do with the fire at 2603, nor with the two tragic deaths that resulted, and is completely innocent.

**Two Suspects Emerge, Neither Of Whom Was Plaintiff Almendarez**

26.     Immediately after the fire, two suspects emerged as possible perpetrators, neither of whom was the Plaintiff.

27.     At least four different people told police that Lisa Velez had threatened to burn down the 2603 building just a few weeks before the fire occurred. Velez had a motive: she believed two of the residents were responsible for her brother's murder, and she wanted revenge.

28.     Detectives also learned that three men and a woman were seen in a car circling the 2603 building several times, just minutes before the fire. They learned that one of the individuals in the car, Francisco Plascencia, was linked to recent arsons in the area and had recently been taken into police custody.

29.     But Defendants did no significant follow-up of either suspect, and the case grew cold.

**The Police Build a False Case Against Plaintiff**

30.     Nine months later, the Police Officer Defendants reopened the case after speaking to Jose "Pepe" Ramirez.

31.     Using Ramirez, Police Officer Defendants set in motion a false pursuit of three innocent men – Arthur Almendarez, John Galvan, and Francisco Nañez – simply to close the case.

32.     Specifically, the Police Officer Defendants claimed that Ramirez saw men near the scene of the fire that night and could identify them by name. Police Officer Defendants

claimed that Ramirez identified those men as including Michael Almendarez (Mr. Almendarez's brother) and John Galvan.

33.     In fact, Ramirez saw no such thing, and the Police Officer Defendants knew it.

34.     On the night of the fire, Ramirez was so heavily intoxicated and high that he was unable to walk without support and was slurring his words. One of the people he was with, Frank Partida, thoroughly discredited Ramirez's statement and explained that not only was Ramirez in no shape to properly observe anything, but that they did not actually see John Galvan or Michael Almendarez in the alley. Partida, a retired marine and neighborhood basketball coach, knew Almendarez and Galvan and would have recognized them if in fact they had been present.

35.     Partida was the only sober one with Ramirez. The only other person present, Rene Rodriguez, was also heavily intoxicated.

36.     Ramirez and Rodriguez did not corroborate each other and offered contradictory and inconsistent recollections of their drunken and drug-laced night nine months earlier.

37.     Despite Partida's statement, which not only excluded Mr. Almendarez but also exposed Ramirez and Rodriguez as thoroughly unreliable witnesses, the Police Officer Defendants settled on Mr. Almendarez, and his co-defendants Mr. Galvan and Mr. Nañez, as people they could pin the two deaths on.

38.     There was not a shred of physical evidence linking Mr. Almendarez to the fire.

### CPD Detectives Conducted Physically and Psychologically Abusive Interrogations Until They Extracted False Confessions

39.     The Police Officer Defendants brought Michael Almendarez to Area Four and questioned him against his will.

40.     Michael told the Police Officer Defendants that he did not have knowledge of the fire.

7

41.     At no point did Michael give them any reason to believe that he knew anything about the fire, let alone that he was involved or saw someone set it.

42.     Unsatisfied, Police Officer Defendants, including but not limited to Defendants Hanrahan and Switski, physically abused Michael, threatened him, and pressured him over the span of several hours, until he adopted a false statement implicating John Galvan and Francisco Nañez.

43.     Michael's false statement claimed that John Galvan and Nañez had confessed their alleged involvement in the fire to him a month after the fire.

44.     As soon as Michael was released from custody, he exposed what the Police Officer Defendants did to him. Michael later testified that his "statement" was false, and that the detectives had forced him to adopt that particular account.

45.     The Police Officer Defendants never revealed that they had forced Michael into implicating other individuals using unconstitutional interrogation tactics.

46.     Armed with Michael's fabricated statement, the Police Officer Defendants, including Defendants Switski and Hanrahan, continued their coercive investigation. They forced Mr. Galvan to Area Four.

47.     At the time, Mr. Galvan was only a teenager. He was alone, with no parent or lawyer present, for the lengthy interrogation that ensued.

48.     Mr. Galvan told Police Officer Defendants the truth: he had no involvement in that fire or the death of the two individuals.

49.     However, Defendants Switski, Hanrahan, O'Dea and other Police Officer Defendants wanted a confession. They embarked on a lengthy and painful interrogation process that included physically abusing Mr. Galvan, including kicking him in the leg and punching him

in the head. Mr. Galvan, overwhelmed from the physical and psychological torture, eventually succumbed and told the detectives he would make a statement.

50.     Police Officer Defendants called in an assistant state's attorney to take Mr. Galvan's statement. Defendant Leighton responded to that request.

51.     In his "confession," Mr. Galvan claimed that he and his friends Arthur Almendarez and Francisco Nañez decided to harm a rival gang member by setting his building on fire. Mr. Galvan's false confession stated that they bought gasoline, filled a beer bottle with it, stuffed the bottle with a cloth, then lit the cloth on fire. The statement went on to say that the boys threw the bottle at the building. According to the statement, the bottle did not ignite the building, so Mr. Galvan went over and threw a lit cigarette at the gasoline, igniting the fire.

52.     Before Defendant Leighton came into Mr. Galvan's interview room, Defendants Switski and Hanrahan provided Defendant Leighton with the scripted false confession Police Defendant Officers wrote out for Mr. Galvan.

53.     When Defendant Leighton first went over the false statement with Mr. Galvan, Mr. Galvan denied that any of the story was accurate. Defendant Leighton did not ask Mr. Galvan any follow-up questions about the inaccurate story he had been given. Instead, he left Mr. Galvan alone in the room with Defendant Switski.

54.     Defendant Switski then pushed Mr. Galvan's head down on the table and threatened that this was the "last time" he was going to warn him.

55.     Terrified, Mr. Galvan went along with the story when Defendant Leighton returned. Defendant Leighton instructed Mr. Galvan that he would need to repeat "everything the way it was written out" for the court reporter, or words to that effect.

56. Defendants Switski and Hanrahan, in conspiracy with the other Police Officer Defendants and Defendant Leighton, used a similar playbook to fabricate two more statements: one from Plaintiff Almendarez and one from Francisco Nañez.

57. Indeed, while the Police Officer Defendants were coercing Mr. Galvan's false and fabricated statements, they were engaged in similar misconduct with Plaintiff Almendarez and Mr. Nañez.

58. Mr. Almendarez was arrested and brought to Area Four. He had no knowledge of or involvement in the fire, and that is what he told the Police Officer Defendants. Determined to get a confession, however, Defendants Hanrahan, Switski, O'Dea and other Police Officer Defendants repeatedly attacked Almendarez with physical violence and threats of more violence.

59. Defendants Hanrahan, Swiski and other Police Officer Defendants interrogated Mr. Almendarez over the course of the day about the supposed arson and deaths.

60. Mr. Almendarez told them repeatedly that he had no knowledge or involvement in the incident.

61. The Defendants proceeded to embark on a lengthy and painful interrogation process that included physically abusing Mr. Almendarez, including kicking him in his genitals and hitting him in his head.

62. Throughout the abuse, Mr. Almendarez protested and continued to profess is innocence.

63. Defendants Switski and Hanranhan took turns interrogating Plaintiff, alternating who was in the room with him. At one point, Defendant Switski came into the interrogation room and told Mr. Almendarez that John Galvan had implicated him and Mr. Nañez in the arson, stating that Mr. Galvan had told the Police Officer Defendants that Mr. Almendarez was the one

that wanted to burn the house down. When he told Mr. Almendarez this, Defendant Switski knew he had procured this false statement from Mr. Galvan through threats and violence.

64.     Plaintiff Almendarez said he could not implicate himself or others in the arson. Defendant Switski responded by striking Mr. Almendarez in his head with his fist.

65.     At one point Defendant Hanrahan returned and told Mr. Almendarez that Mr. Galvan and Mr. Nañez had both made statements implicating him. Defendant Hanrahan falsely told Mr. Almendarez that all he had to do was make a statement implicating them and Mr. Almendarez could go home to his family.

66.     Defendant Hanrahan had a fabricated statement already prepared for Mr. Almendarez to sign that was written out on a piece of paper.

67.     Defendants Hanrahan and Switski also used psychologically coercive tactics with Mr. Almendarez.

68.     Specifically, Defendants Hanrahan and Swtiski threatened Mr. Almendarez that he would never see his baby daughter again and she would be raised without him. They also threatened that his daughter would be vulnerable to harm if he was imprisoned and could not protect her.

69.     At one point during the course of the interrogation, Defendant Hanrahan was in the interrogation room with Mr. Almendarez going over what he was supposed to say. After Hanrahan left the room, Defendant Switski entered the room and was angry. Switski pressed his foot on Mr. Almendarez's genitals against a chair causing excruciating pain.

70.     Mr. Almendarez continued to maintain his innocence, but eventually Defendant Switski took him in an elevator in the station and put what felt like the barrel of a gun to the back of his head. Defendant Switski threatened that he would take Mr. Almendarez to the basement

and kill him and no one would care because he would claim that Mr. Almendarez threatened him.

71.     After this threat, Mr. Almendarez succumbed and agreed to go along with Defendants Hanrahan's and Switski's story.

72.     Defendants Switski and Hanrahan had Defendant Leighton come back to take Mr. Almendarez's statement.

73.     When Defendant Leighton entered the room, Mr. Almendarez told him that Defendants Switski and Hanrahan had abused him. Defendant Leighton said he forgot a piece of paper and left the room.  Police Officer Defendants then re-entered the room and resumed their physical and psychological torture.

74.     This cycle repeated when Defendant Leighton re-entered the room. Mr. Almendarez, again, told Defendant Leighton that Defendants Switski and Hanrahan had abused him. Again, Defendant Leighton made up an excuse to leave the room, so that Defendants Switski and Hanrahan could re-enter and resume their torture.

75.     Eventually, Mr. Almendarez's will was overborne and he, too, signed a false confession implicating himself, Mr. Galvan, and Mr. Nañez in the fire. Defendant Leighton took this statement despite having direct knowledge that Police Officer Defendants had physically abused Mr. Almendarez.

76.     During that same day, Police Officer Defendants had Mr. Nañez arrested and brought into Area Four.

77.     Mr. Nañez had been consuming drugs and alcohol before he was brought to Area Four and was clearly highly intoxicated when Police Officer Defendants brought him to an into

12

an interrogation room. Still, Mr. Nañez took care to request a lawyer several times. Police Officer Defendants ignored him.

78.     Despite Mr. Nañez's visible intoxication and heightened susceptibility to manipulation, Police Officer Defendants used similar coercive and physically abusive interrogation techniques on him. Nonetheless, Mr. Nañez told the officer defendants the truth and denied any knowledge of or involvement in the fire.

79.     However, after hours of interrogation, Mr. Nañez was also forced into signing a false and fabricated confession.

80.      Defendant Leighton introduced himself to Mr. Nañez as the State's Attorney who would be taking his confession. Again, Mr. Nañez requested his own lawyer. Defendant Leighton, like the Police Officer Defendants, ignored him and took his statement anyway.

81.     By the time they were finished, the Police Officer Defendants had scripted the three separate false confessions, which differed in some respects–such as which of the three men retrieved the gas, the type of container the gas was carried in, and how the makeshift Molotov cocktail was lit – but contained the same key false details about how the fire started.

82.      The story, however, was a scientific impossibility. There is no way the fire could have occurred as the false confessions described.

### The Defendants Fabricate Arson Evidence

83.     The story Police Officer Defendants made up was the direct result of Defendants Scheithauer's, Gall's, and Lumsden's rushed investigation. Prior to their investigation of the scene, Defendant Fire Investigators knew that Soccoro Flores told Defendant Centracchio that she saw a young man throw an object at 2306 prior to the fire.

84.     This statement tainted Defendant Fire Investigators' investigation. Instead of searching for the fire's origin in an unbiased manner, the Defendants sought out evidence to confirm their preconceived arson theory. This resulted in an incomplete investigation which solely pointed to an intentionally set fire, without fully ruling out the possibility that it was accidental.

85.     Defendant Fire investigator's armed Police Officer Defendants with an arson theory and laid the groundwork for their eventual scientifically impossible story.

86.     The arson story laid out in the "confessions" was provably false.

87.     First, multiple, highly credentialed arson experts have all concluded that it is scientifically impossible for a burning cigarette to ignite a flammable gasoline vapor, the very premise for the arson as detailed in Mr. Galvan's supposed confession.

88.     This fact has been well-known in the fire science community for decades, long before the CPD Bomb & Arson Section conducted its analysis of the 2603 fire's cause and origin.

89.     Second, it was neither possible nor scientifically valid to narrow the origin of the fire to the first floor back porch based on the evidence available. Defendant Fire Investigator's conclusion that the fire started there was not supported by proper and available science on fire patterns.

90.     In fact, the scene evidence more strongly indicated that the fire started in the stairwell—a location that could not have been reached by a bottle thrown from the alley, nor even by a person who walked up and threw his lit cigarette on the porch. Here, too, the involuntary and fabricated confession were demonstrably false.

14

91.     Third, the volume of gasoline that could be kept in a 12-ounce beer bottle could not ignite a fire of this size. The presence of broken green glass, moreover, did not match the glass bottle described in the falsified confessions. In other words, the story that Defendants fed Mr. Almendarez, Mr. Galvan, and Mr. Nañez, was scientifically absurd and could not possibly have resulted in the fire that engulfed 2603 and caused two fatalities.

92.     Defendant Scheithauer's and Defendant Lumsden's cause and origin determination failed to follow the scientific method, was unreliable, and was wrong.

93.     In fact, there was no evidence then or now that the fire was intentionally set in the first place.

### Other Evidence Debunked The Police Case

94.     Soccoro Flores, who was awake when the fire started and believed she saw someone throw something into the 2603 building, was brought to CPD Area Four to view a live line-up.

95.     Flores viewed Mr. Almendarez, Mr. Galvan, and Mr. Nañez and did not identify any of them as the person she saw on the night of the fire.

### Mr. Almendarez's Trial Proceedings and Conviction

96.     Arthur Almendarez was entirely innocent of the crime.

97.     No physical evidence ever connected Mr. Almendarez in any way to the crime.

98.     When the fire was first investigated, not a single witness mentioned anything about Mr. Almendarez being involved in the murders.

99.     All of the third-party evidence that the Police Officer Defendants claimed had led them to Mr. Almendarez completely unraveled during the course of the prosecution.

100.    Third-party witness, Michael Almendarez, testified at pre-trial proceedings that detectives made up the false statement they made him sign.

101.    Soccoro Flores testified that she did not identify Mr. Almendarez as the person she saw in the alley that night.

102.    Jose Ramirez gave testimony that was inconsistent with the CPD Defendants' police reports and completely contradicted more reliable witnesses.

103.    The only evidence against Mr. Almendarez came from the false and manufactured "confession" that the Police Officer Defendants and Defendant Leighton forced him to make.

104.    But for Police Officer Defendants' physical and psychological abuse, as well as the story they fed to each of these three men, there would have been no "confessions."

105.    Mr. Almendarez, Mr. Galvan, and Mr. Nañez each reported their abuse as soon as it happened.

106.    Mr. Almendarez reported his abuse to Defendant Leighton at Area Four when he came to take his statement, to jail personnel during the medical intake procedure, and to his criminal defense attorney.

107.    Mr. Galvan reported Police Defendant Officers' abuse to his criminal defense attorney.

108.    Mr. Nañez called his parents and told them about his experience as soon as he was allowed a phone call.

109.    Each has maintained consistently, for decades, that the Police Officer Defendants used similar tactics of violence and psychological coercion to coerce their false confessions.

**Switski's Pattern of Misconduct That Extended to Mr. Almendarez**

110.    Prior to Mr. Galvan's interrogation, Defendant Switski had coerced false confessions from other innocent people using the same tactics and methods that they used on him.

111.    That is because Defendant Switski's misconduct in this case is part of a pattern of investigative misconduct, including but not limited to manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing confessions and false statements from suspects and witnesses through physical and psychological violence. Defendant Switski's pattern of misconduct includes the following examples supported by sworn testimony:

112.    In May 1984, Defendant Switski and his partner coerced a false confession from fourteen-year-old Ritchie Cole through physical and psychological abuse. Cole served five years in prison before the appellate court reversed his conviction on the basis that Cole was illegally arrested.

113.    In May 1984, Defendant Switski coerced a false confession by physical abuse from Anselm Holman, by, amongst other things, beating him in the head with a phone book so hard that Holman lost consciousness. Defendant Switski also slapped and punched Holman at times during his interrogation, while simultaneously lying and promising Holman he could go home if he signed a pre-written statement. Holman did so to stop the abuse.

114.    In May 1984, Stitski beat a confession out of seventeen-year-old Kenneth Fisher. While Mr. Fisher has not professed innocence of the murder he was convicted, Fisher has never wavered that Switski and his partner tortured him in order to extract his confession to the crime.

17

115.     In September 1985, Defendant Switski and his partners tortured Freddie Halmon for two and a half days, including physically beating him and depriving him of food and sleep. Halmon eventually falsely confessed to a murder.

116.     In October 1985, Defendant Switski and his partners coerced Laroy Mitchell to falsely confess to murder. Mitchell was instructed to study a piece of paper with the police story about the murder had occurred and to recite that information to a prosecutor. When Mitchell refused, Defendant Switski and the other officer beat Mitchell on his stomach and legs with a small black object and threatened that if he did not cooperate with them, he would never go home or see his family again.

117.     In February 1988, Defendant Switski along with other officers coerced a false murder confession from Andre Slater during a three-day interrogation. Defendant Switski was part of the third set of officers that interrogated Slater, during which time the physical coercion escalated. Defendant Switski slapped, hit, and punched Slater in the head; he then slammed Slater's head into the wall until he succumbed to the will of his abusers.

118.     In March 1989, Defendant Switski coerced Carnell Carey to confess. When Defendant Switski and his partner began their interrogation of Carey, he asked for a lawyer. In response, Switski slapped Carey with paperwork twice in the face. Throughout his interrogation, Carey repeated his request to talk to a lawyer, and in response, Defendant Switski physically beat and threatened him. Carey eventually succumbed and agreed to make a statement to the prosecutor to make the physical abuse stop.

119.     Given this history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Defendant Switski and others, it is apparent that Defendants

18

engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

## Arthur Almendarez's Exoneration

120.    On the strength of his "confession" alone, Mr. Almendarez was convicted of aggravated arson and first-degree murder. He was sentenced to life in prison.

121.    Mr. Almendarez and his family never gave up trying to prove his innocence.

122.    After serving more than 35 years in prison, his conviction was vacated by the Illinois Appellate Court.

123.    On July 21, 2022, the State dismissed all charges against him.

124.    For nearly four decades, Mr. Almendarez was forced to live in a cage and serve out a punishment for crimes he did not commit.

125.    Mr. Almendarez's life has been gravely and permanently damaged by spending three and a half decades in prison for a crime he did not commit.

## Mr. Almendarez's Damages

126.    For nearly four decades, Mr. Almendarez was required to live in conditions that have been described by a judge and watchdog groups as inhumane and damaging to the physical and mental health of prisoners. A constant atmosphere of fear, distrust, and threats of violence from prisoners and staff alike permeated the prison environments.

127.    For more than thirty- five years, Mr. Almendarez was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, funerals, and other life events with loved ones, and was deprived of the fundamental freedom to live his life as an autonomous human being.

19

128.    Mr. Almendarez missed out on raising his two daughters, sharing in their important life events such as birthdays, graduations and all the special moments in a child's life.

129.    Mr. Almendarez's years of wrongful incarceration forced him into a world of isolation in which he lost contact with many of his friends and family in the outside world.

130.    Mr. Almendarez must now attempt to make a life for himself outside of prison without the benefit of nearly four decades of life experiences, which normally equip adults for the task.

131.    As a result of Defendants' misconduct, Mr. Almendarez has suffered and will continue to suffer tremendous damage, including psychological trauma and emotional distress.

**The City's Policy and Practice of Wrongly Convicting Innocent Individuals**

132.    The City of Chicago is responsible for scores of miscarriages of justice like those the Officer Defendants inflicted on Plaintiff by virtue of its policies and practices.

133.    Since 1986, no fewer than 200 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to convict innocent people for serious crimes they did not commit—numerous of which involve the named Officer Defendants.

134.    These cases include many in which Chicago police officers used the same tactics the Police Officer Defendants employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary, false, and fabricated confessions; (2) fabricating witness statements; and (3) concealing exculpatory evidence.

135.    At all times relevant hereto, members of the Chicago Police Department, including the Police Officer Defendants in this action, routinely manufactured evidence against innocent people by coercing, manipulating, threatening, pressuring, and offering inducements to

suspects and witnesses to obtain false statements implicating innocent people, knowing full well those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Officer Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false narratives as their own so police could secure the wrongful conviction of innocent people.

136.     The City's widespread practice of torturing individuals into false confession was documented in a 1990 report prepared by the City's Office of Professional Standards ("OPS") after conducting a review and investigation of allegations of physical torture and abuse by Commander Jon Burge and other officers by OPS Investigator Michael Goldston ("Goldston Report"). The Goldston Report found that the abuse was "systematic."

137.     The Goldston Report "identified [fifty] alleged victims of misconduct by personnel assigned to Area 2. The dates of the alleged incidents range from May 1973 through October 1986.  The Goldston Report further identified twenty-six investigations by the City into officer misconduct that had been assigned to OPS and the Internal Affairs Division of the CPD. Of the 26 CR Files identified by in the Goldston Report, the City had closed twenty-five of them "with no sustained findings" and one remained open as of the time of the Goldston Report.

138.     The City did not take any steps to re-open or re-investigate any of those cases. Nor did the City take any steps to institute any policy or supervision of its officers in conducting interrogations to address the findings of the Goldston Report.

139.     As a result, the City's widespread policy of physically and psychologically coercing suspects into false confessions persisted.

140.     Indeed, even after the City terminated Jon Burge in 1993, its widespread practice of coercing false confessions continued in the 1990s when detectives, such as Kenneth Boudreau

and John Halloran, continued to coerce and fabricate false statements from suspects and witnesses.

141.    In an article examining thousands of murder cases in Chicago from 1991 through 2000, the Chicago Tribune found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

142.    That article specifically examined inculpatory statements taken by Defendant Boudreau. According to the Tribune's survey, "Boudreau stands out not only for the number of his cases [with confessions] that have fallen apart, but for the reasons." For example, in those cases, Boudreau has been accused by defendants of punching, slapping or kicking them, just as the officers did with the witnesses here.

143.    In total, Defendant Boudreau managed to obtain murder confessions from more than a dozen people in which the charges were either dropped or the defendant was acquitted notwithstanding the supposed confessions. Likewise, he has obtained coerced inculpatory statements from witnesses to corroborate those false confessions.

144.    For a two-year period in the early 1990s, for example, Defendant Boudreau and his partner, Defendant Halloran helped "solve" at least five murders with "confessions" that ended with acquittals. All of these suspects alleged that Boudreau and/or Halloran mistreated them to obtain false confessions.

145.    Defendant Boudreau's and Halloran's misconduct in soliciting false "confessions" and witness statements were just two of the more prominent examples of the widespread policy and practice within the Department.

146.     In addition, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

147.     At all times relevant hereto, members of the Chicago Police Department, including the Officer Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to other participants in the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of an investigation, rather than being maintained as part of the official file.

148.     Consistent with the municipal policy and practice described in the preceding paragraphs, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff. The Officer Defendants also maintained clandestine files that were not turned over to the prosecutor and were destroyed or hidden at the close of their investigations, including, for example, documents relating to witness interviews.

149.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536 (N.D. Ill.), among others.

150.     The policy and practice of file suppression at issue in *Fields* was in place from the 1980s through the 2000s, including during the commission and investigation of the 2603 fire and deaths described above.

23

151.     Additionally, a set of clandestine street files was found in the case of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.). Those files, which emanated from a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants. This means that this policy and practice was also in place during the commission and investigation of the 2603 fire and deaths.

152.     In addition to the problems identified above, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

153.     Before and during the period in which Plaintiff was falsely charged with the murders associated with the fire at 2603, and then later convicted, the City of Chicago operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating civilians' civil and constitutional rights. And the Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

154.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, its failure to investigate cases in which the police are implicated in a wrongful charge or conviction, its failure to discipline officers accused of serious misconduct, and its facilitation of a code of silence within the Chicago Police Department, officers (including the Officer Defendants here) have come to believe that they may, without fear of adverse consequences, violate the civil rights of members of the public and cause the innocent to be charged with serious crimes. As a

result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

155.    The City of Chicago and its Police Department also failed in the years before Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a)    The need to refrain from physical and psychological abuse of, and manipulative and coercive conduct toward, suspects and witnesses.

b)    The constitutional requirement to disclose exculpatory and impeachment evidence, including how to identify such evidence and what steps to take when exculpatory and/or impeachment evidence has been identified to ensure the evidence is part of the criminal proceeding.

c)    The risks of engaging in tunnel vision during investigations.

d)    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

156.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

157.    The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers

underprepared to police effectively and lawfully. Officer errors and misconceptions that result

from lack of training are not corrected in the field, because CPD has neither structured

supervision in a way that will adequately support officers, nor invested in programs and systems

that will detect when officers are in need of help or exhibiting behavior that must be corrected.

Officers' ability to stay safe, protect public safety, and police within constitutional standards

suffers as a result."

158.    On the subject of supervision, the DOJ concluded among other things that

"[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for

constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for

supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for

supervisors to hold officers accountable when they deviate from CPD policy and the law. The

City has long known that CPD's direct supervision of officers is inadequate, including through

the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's

supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to

CPD's supervision structure and processes, and community and officer safety suffer as a result."

159.    The DOJ "confirmed that CPD's accountability systems are broadly ineffective at

deterring or detecting misconduct, and at holding officers accountable when they violate the law

or CPD policy." In particular, the Department of Justice found that the City failed to investigate

nearly half of misconduct complaints; where investigations did occur, there were "consistent

patterns of egregious investigative deficiencies"; and where misconduct complaints were

sustained, discipline was inconsistent and unpredictable.

160.    Similarly, the Chicago Police Accountability Task Force reported in April 2016

that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to

make accountability an organizational priority." Between 2004 and 2016, the City recommended disciplinary action in fewer than 4% of cases in which it paid settlements to plaintiffs alleging violation of their civil rights, and did not conduct any disciplinary investigations in over half of those cases.

161.    Since before Mr. Galvan, Mr. Almendarez, and Mr. Nañez's arrest and continuing for years afterward, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

162.    Charlie Beck, the former interim superintendent of the CPD, acknowledged the existence of the CPD's code of silence as did former Mayor Rahm Emmanuel in the wake of the Laquan McDonald shooting.

163.    As a result of the City of Chicago's established practices, Defendant Officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

164.    Defendant Officers engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

165.    These Defendants also worked in Area 4 alongside notorious Chicago Police
Detective Kriston Kato, who has a long history of engaging in the kind of investigative
misconduct that occurred in this case, including physical torture, is well-known and widely
acknowledged.

166.    There are several known cases in which Kato, his partners, his colleagues, and
other Chicago police officers engaged in the serious investigative misconduct described above.
They engaged in such misconduct because they had no reason to fear that their supervisors
would ever discipline them for doing so.

167.    The City's failure to train, supervise, and discipline its officers, including Police
Officer Defendants and Defendant Fire Investigators, condones, ratifies, and sanctions the kind
of misconduct that the Defendants committed against Mr. Galvan, Almendarez, and Nañez in
this case. Constitutional violations such as those that occurred in this case are encouraged and
facilitated as a result of the City's practices and de facto polices, as alleged above.

168.    The City of Chicago and final policymaking officials within the Chicago Police
Department failed to act to remedy the patterns of abuse described in the preceding paragraphs,
despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful
practices and ensured that no action would be taken (independent of the judicial process) to
remedy Plaintiff's ongoing injuries.

169.    The policies and practices described in the foregoing paragraphs were also
approved the City of Chicago policymakers, who were deliberately indifferent to the violations
of constitutional rights described herein.

## CLAIMS FOR RELIEF

## COUNT I – 42 U.S.C. § 1983

**Due Process**
**(Fourteenth Amendment)**
**All Individual Defendants**

170.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

171.     In the manner described more fully above, all Individual Defendants, while acting individually, jointly, and in conspiracy with one another and others, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

172.     In the manner described more fully above, all Individual Defendants fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

173.     In addition, Individual Defendants suppressed evidence that would have demonstrated Plaintiff's innocence. Defendants deliberately withheld exculpatory evidence from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

174.     In addition, based upon information and belief, these Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

175.     These Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

29

176.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

177.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

### COUNT II– 42 U.S.C. § 1983

**Coerced and False Confession**
**(Fifth and Fourteenth Amendments)**
**Defendants Switski, Hanrahan, Almanza, O'Dea,**
**Jones, Centracchio, Capesius, Jin and Leighton**

178.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

179.    In the manner described more fully above, Police Officer Defendants and Defendant Leighton forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

180.    In addition, the Police Officer Defendants used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

181.    In addition, the Police Officer Defendants along with Defendant Leighton fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

30

182.     Specifically, these Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary and false statements implicating himself in the fire.

183.     Those false incriminating statements were wholly fabricated by all Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted.

184.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

185.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

186.     The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described in Count VI.

### COUNT III – 42 U.S.C. § 1983

**Deprivation of Liberty and Detention Without Probable Cause
(Fourth and Fourteenth Amendments)
Defendants Switski, Hanrahan, Almanza, O'Dea,
Jones, Centracchio, Capesius, Jin and Leighton**

187.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

188.     In the manner described more fully above, the Defendants, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of

31

their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and to cause the detention of Plaintiff, without probable cause.

189.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty and detained without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

190.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

191.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

192.    The Defendants' misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene
### All Individual Defendants

193.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

194.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

195.    As result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. The Defendants had ample, reasonable opportunities to prevent this harm but failed to stop the constitutional violation.

32

196.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

197.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

198.     The Defendants' misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT V – 42 U.S.C. § 1983

### Conspiracy to Deprive Constitutional Rights
### All Individual Defendants

199.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

200.     The Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

201.     In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

202.     In furtherance of this conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

203.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

204.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

205.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI – 42 U.S.C. § 1983
### Policy and Practice Claim Against the City of Chicago

206.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

207.    As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

208.    Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policymaking officials for the City of Chicago.

209.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal

34

proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

210.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

211.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals questioned regarding criminal activity, such as the witnesses in this case, were routinely coerced against their will to involuntarily falsely implicate others in crimes. It was common that witnesses interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago provided false statements, under extreme duress and after suffering abuse, accusing others of committing crimes.

212.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which witnesses were coerced to falsely implicate others by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to

35

remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

213.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; (5) pursued wrongful convictions through profoundly flawed investigations; and/or officers failed to document misconduct by fellow officers and would instead turn a "blind eye" to the misconduct.

214.    These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper

interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

215.    The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

216.    As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

217.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

218.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VII – State Law Claim**

**Malicious Prosecution**
**All Individual Defendants**

219.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

220.    In the manner described above, the Defendants, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff

of murder, and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff for that crime, without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

221.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

222.    The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

223.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

224.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII – State Law Claim

### Intentional Infliction of Emotional Distress
### All Individual Defendants

225.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

226.    The actions, omissions, and conduct of the Defendants, acting as investigators and as set forth above, were extreme and outrageous.

227.    These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

228.    As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered and continues to suffer emotional distress and other grievous and continuing injuries

and damages set forth above.

### COUNT IX – State Law Claim

### Civil Conspiracy
### All Individual Defendants

229.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

230.    As described more fully in the preceding paragraphs, the Defendants, acting in

concert with other known and unknown co-conspirators, reached an agreement among

themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to

accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed

among themselves to protect one another from liability for depriving Plaintiff of these rights.

231.    The violations of Illinois law described in this complaint, including the

Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional

distress, were accomplished by Defendants' conspiracy.

232.    The misconduct described in this Count was objectively unreasonable, was

undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

233.    As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional

pain and suffering, and other grievous and continuing injuries and damages set forth above.

### COUNT X – State Law Claim

### *Respondeat Superior*

234.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

235.    In committing the acts alleged in the preceding paragraphs, the Chicago police Defendants were employees of the City of Chicago and the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

236.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI – State Law Claim

### Indemnification

237.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

238.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

239.    Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described above.

240.    The City is liable to indemnify any compensatory judgment awarded against the Defendants.

WHEREFORE, PLAINTIFF ARTHUR ALMENDAREZ respectfully requests this Court enter a judgment in his favor and against Defendants CITY OF CHICAGO, Defendants former Detectives VICTOR SWITSKI, GERI LYNN YANOW, as SPECIAL REPRESENTATIVE for JAMES HANRAHAN AND JACK LUMSDEN,  LEROY ALMANZA, MARJORIE O'DEA, THOMAS JONES, DANIEL CENTRACCHIO, JAMES CAPESIUS, TONY JIN, MARK SCHEITHAUER, ROBERT GALL, former Cook County State's Attorney JOEL LEIGHTON, and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, awarding compensatory damages, attorneys' fees, and costs against each

Defendant and, because they acted willfully, wantonly, and/or maliciously, punitive damages

against each of the individual Defendants, and any other relief this Court deems just and proper.

**JURY DEMAND**

Plaintiff, ARTHUR ALMENDAREZ, hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

 /s/ Heather Lewis Donnell
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Heather Lewis Donnell
Josh Tepfer
Roshna Bala Keen
Lauren Carbajal
Loevy & Loevy
311 North Aberdeen
3rd Floor
Chicago, Illinois 60607
(312) 243-5900